## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Barry Segal, | **COURT FILE NO. 18-CV-2333 (DSD/HB)** |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Metropolitan Council, | |
| Defendant. | |

## INTRODUCTION

The bus is the primary mode of transportation for many people who are blind, deaf or DeafBlind. They walk to the bus stop and wait at the bus stop sign. The bus drives to the bus stop where the passenger is waiting. The passenger enters the bus and the driver communicates the bus route number by speaking or by hand signals. If the bus is the one the blind or deaf passenger wants to take, the passenger enters and takes a seat. If the bus is not the one the passenger is waiting for, the passenger exits the bus to wait for the next one. This is a simple procedure prescribed for transit agencies by the U.S. Department of Transportation ("DOT") and the Federal Transit Administration ("FTA") in order to ensure that people who are blind or deaf have access to the transportation they need.[1]

Barry Segal is a person who is DeafBlind. He has extremely low vision and cannot hear. He uses Metro Transit buses to travel to work, appointments, and other places. For

---

[1]Discussion of the laws, including the relevant Department of Justice ("DOJ") and the FTA regulations, appears beginning on page 14 of this Memorandum.

the past four years, Barry Segal has not been able to rely on Metro Transit to provide reliably accessible bus service required by DOT/FTA requirements. On at least 150 occasions when Mr. Segal waited at the Metro Transit TSign (the sign identifying the bus stop location), Metro Transit buses did not stop at the TSign. Often bus drivers do not stop close enough to the TSign to allow Mr. Segal to safely enter the bus and learn the bus route number. Other times bus drivers pass by bus stop where Mr. Segal is waiting without stopping and do not communicate the bus route information to him. Frequently this has caused him to be late for work, or to miss appointments.

Each time Mr. Segal walks to the bus stop, he never knows whether the bus will stop for him.

Metro Transit admits it has been aware of this ongoing problem since 2016. The undisputed facts demonstrate Metro Transit verified at least 75 occasions when its buses did not stop reasonably close to the TSign and/or did not communicate the bus route to Mr. Segal. Goetz Exhibits 2, 3.[2] (*See* Goetz Declaration, ¶¶ 2-6 for an explanation of how Plaintiff calculated the total number of verified incidents.) In addition, Metro Transit has received 153 complaints about buses not stopping at the TSign from other people with disabilities. (Joint Exhibit 7A-C; HG-7). But the problem has continued for four years, because, as the undisputed facts show, Metro Transit did not monitor and train its drivers to correct the problem as the law requires it to do.

---

[2]Hereafter, Goetz Declaration exhibits will be identified as HG-#; Joint exhibits (those submitted jointly by both parties pursuant to Stipulation) will be identified as J-#; and Macpherson Declaration exhibits will be identified as RJM-#.

2

## FACTS

Barry Segal is a 52-year-old man who has extremely poor vision (20/600) caused by two medical conditions, Optic Atrophy (OA) and Epiretinal Membrane (ERM). He can see some shapes and objects, but he cannot see the objects clearly. (*See* Barry Segal Declaration, ¶¶ 1, 4-8 (hereinafter "Segal Decl."); J-10, pp. 10-13). Mr. Segal is also profoundly deaf. He identifies himself as DeafBlind. (Segal Decl., ¶¶ 3, 11; J-10, pp. 11-13). A photograph of Mr. Segal and his service dog, Daisy, is attached to the Macpherson Declaration as RJM-1.

Mr. Segal has worked at Lutheran Social Services in St. Paul as an Accounting Systems Specialist since 2014. (Segal Decl., ¶ 16; J-10, pp. 15-17). From Monday to Friday each week he rides Metro Transit buses between his home in the Uptown area of Minneapolis and his workplace in St. Paul. (Segal Decl., ¶ 18; J-10, pp. 19- 24).

Defendant Metropolitan Council is a political subdivision of the State of Minnesota. It operates Metro Transit, the public transit authority that provides, bus, light rail, and other transit services for the Twin Cities Metropolitan Area. (Answer, ¶¶ 13-15).

### *Mr. Segal's Procedure for Riding Buses*

When Mr. Segal rides the bus, he walks to the TSign at his bus stop and waits there. Metro Transit has installed a TSign at the bus stop to identify where riders should

wait for the bus and to identify the bus stop and identify for drivers where the bus should stop.[3]

Like other blind and DeafBlind passengers, Mr. Segal has been trained by Orientation and Mobility (O & M) trainers how to independently navigate the bus system and to get around the Twin Cities area. (Segal Decl., ¶¶ 33-38; J-10, pp. 38-40, 48-51, 53, 57, 78-79).[4] He was trained by O & M trainers to wait for the bus at the TSign because that is where the buses are supposed to stop and because that is where buses are required to stop and where bus drivers expect blind and DeafBlind riders to be waiting. (Segal Decl., ¶¶ 34; J-3; J-10, pp. 38-40; J-17, p. 13).

Mr. Segal knows when a bus has arrived because he can see the outlines of its size and shape. But he and other blind riders cannot see whether it is a Metro Transit bus and cannot see the electronic route sign on the front of the bus. (Segal Decl., ¶ 9; J-10, pp. 41; 44). As he was trained to do by O & M instructors, Mr. Segal must approach the entry door and enter the bus to communicate to the driver the bus route he is waiting for by hand signals or by using his voice. If the driver communicates that the bus route is the one Mr. Segal wants, he takes a seat on the bus. If the driver communicates that it is a different route, Mr. Segal exits the bus and returns to the TSign to wait for the next bus. (Segal Decl., ¶ 23; J-17; pp. 11-12).

---

[3] An illustration of a Metro Transit TSign is attached as RJM-9. The TSign also appears in the Where to Stop Training Video (J-5).

[4] A detailed description of O & M training and its application to public transportation use by people who are DeafBlind is found in J-17, pp. 6-9.

4

This is the same procedure Metro Transit policy directs its drivers to follow. (J-1; J-3; J-5; J-11, pp. 36-36; 53).

*Defendant's Drivers Are Required to Stop at the TSign and Identify the Bus Route*

The procedure Metro Transit requires its bus drivers to follow for stopping at the bus stop and identifying the bus route is illustrated in a video recording Metro Transit made for its drivers.[5] (J-5). The video confirms that Mr. Segal follows the procedures taught to the drivers. It shows a blind passenger standing at the TSign and waiting for the bus. The driver pulls up to the TSign where a passenger is waiting and communicates the bus route to the waiting rider.

The video also illustrates the procedure a bus driver should follow when another bus is already waiting at the TSign. The second bus is required to wait until the first bus leaves and then pull forward to the TSign to identify the bus route for waiting riders. The second bus is not allowed to pull around the first bus and leave without stopping at the TSign because this prevents the riders from learning the bus route.

This procedure is also set forth in *Metro Transit Operations Manual* (J-3) and in Metro Transit Policy Bulletins (J-1).

*Mr. Segal's Complaints*

Between September 2016 and December 2019, Mr. Segal submitted 150 complaints to Metro Transit management. His complaints comprise two categories: when

---

[5]Metro Transit did not create the Where to Stop video until late November 2017 (J-11, pp. 48, 51-52). This was more than a year after Mr. Segal began reporting problems with bus drivers failing to stop at the TSign and announce the bus route. (J-6A; J-8).

bus drivers did not stop at the TSign, and when drivers of second buses did not pull up to the TSign and announce the route (hereafter referred to as "Second Bus Incidents"). (Segal Decl., ¶ 30; J-8). Exhibit HG-3 is a compilation of all of Mr. Segal's incidents organized chronologically. The data from which it was created is drawn from spreadsheets created by Defendant to track Mr. Segal's complaints. (Goetz Decl., ¶ 6c).

It is undisputed that Metro Transit verified as accurate 75 incidents involving Mr. Segal. (J-6A; J-16, p. 16; HG-2; HG-3). However, even after Defendant verified his complaints, the problems have continued.

RJM Exhibits 8 A-E are portions of Metro Transit bus surveillance videos which show a few examples of the kinds of incidents Mr. Segal experienced. Metro Transit verified that all of these incidents occurred and were violations of the Where to Stop policy (J-6A):

- September 22, 2016): Single bus failure to stop at the TSign. When the driver pulls away without Mr. Segal, he pounds on the door to get the driver to stop. RJM-8 a.

- August 22, 2018: Bus drives past the bus stop without stopping. Mr. Segal chases the bus and the driver stops in the next block. When Mr. Segal complained to the bus driver, she called the police. Mr. Segal was not arrested or charged with any crime. (J-12, pp. 150-51). Metro Transit verified Mr. Segal's complaint. RJM-8 b.

- December 20, 2018: The second bus pulls into bus stop area. Mr. Segal and Daisy are clearly visible through the windshield. When the first bus leaves, the second bus drives past Mr. Segal without stopping. RJM-8 c.

- April 5, 2019: Second bus in line incident. The bus driver pulls around the first bus in line and passes the stop. The driver stops some distance past Mr. Segal, opens the door, then closes it when Mr. Segal appears and drives away without him. Metro Transit verified Mr. Segal's complaint. RJM-8 d.

- October 7, 2019: Bus driver fails to stop at the TSign. When Mr. Segal gestures for the driver to move forward, the driver still does not pull forward. When the bus leaves without Mr. Segal, he has to chase after the bus before it stops for him. RJM-8 e.

As a result of the failures of Defendant's buses to stop at the TSign and communicate the bus route, Mr. Segal has been late for work approximately 5-10 times and has missed approximately three appointments. (J-10, pp. 31-32; Segal Decl., ¶ 32.)

Mr. Segal has not been able to use Metro Transit buses since December 2019 because of the severe winter weather and because of the COVID 19 pandemic. (Segal Decl., ¶¶ 18-19). Consequently, he has not reported any violations to Metro Transit since December 2019. He expects to return to using the bus as soon as it is safe to do so. (Segal Decl., ¶ 20).

<i>Buses Fail to Stop at the TSign</i>

When a bus approaches Mr. Segal waiting at the TSign, he needs to board the bus to determine whether it is the bus he is waiting for. (Segal Decl., ¶ 23; J-17, p. 11). If the bus does not stop close to TSign, Mr. Segal cannot determine if there is a safe path to the bus that is clear of obstacles. (Segal Decl., ¶¶ 12-13; J-17, pp. 14-15). Also, because he is

7

deaf, Mr. Segal, and other riders who are deaf, cannot hear if the bus drive simply opens the door and shouts the bus route number at him. The driver must communicate directly to him the route using gestures or body language. (Segal Decl., ¶ 23; J-16, p.101; J-17, p. 11-12).

*Second Bus Incidents*

When a second bus pulls up behind a bus that has already stopped at the TSign where Mr. Segal is waiting, Metro Transit's policy is that the second bus driver must wait for the first bus to leave the stop, then pull forward to the TSign and communicate its route number to Mr. Segal. (J-1; J-2; J-3; J-4; J-5). Drivers must communicate the bus route number to riders who are deaf or blind. (J-14, p. 56). Defendant's Where to Stop video illustrates the procedure.

Christy Bailly, Metro Transit's Director of bus operations, admits that the failure of a second bus to move up and announce its route when a first bus leaves is an ADA violation. (J-15, p. 184).

Often when Mr. Segal is waiting at the TSign, the second bus driver does not wait for the first bus to leave. Instead the driver pulls out around the first bus and leaves, without announcing its route number. Mr. Segal can see that a second bus has left without stopping, because he can see the shape of the bus, its color, and its movement. But he does not know the bus route number, unless the second bus driver pulls up to the stop and communicates it. (J-14, p. 63; J-10, pp. 37-38; 44-46; Segal Decl., ¶¶ 23-24). When the second bus leaves without the driver announcing its route number, Mr. Segal has no way to know if the bus that left without him is the bus he was waiting for. (*Id.)*

8

Defendant admits that it has verified 23 violations when the second bus in line fails to wait for the first to leave and then pull up to the stop and announce its route number. HG-1. Ms. Bailly, Defendant's Director of Bus Operations, testified that MTC verified all of the Second Bus Incidents Mr. Segal reported. (J-12, pp. 192-193).

*Metro Transit's Procedure for Verifying Mr. Segal's Complaints*

 Each time Mr. Segal submitted a complaint report to Metro Transit, Metro Transit reviewed the report and determined whether it was accurate. All of Mr. Segal's complaints and the videos concerning those complaints were reviewed by Bus Operations Director Bailly. She watched the bus surveillance video for each incident and determined whether Mr. Segal's complaint was correct. (J-12, p. 131, 165-167, 191; J-14, pp. 14-15, 33).

If the bus driver stopped the bus at a location where Mr. Segal was <u>not</u> visible in the video through the entry doors of the bus or if the driver does not announce the bus route number, Ms. Bailly determined the complaint was correct and verified it. (J-12, p. 190; J-14, pp. 33-34). She also determined Mr. Segal's complaints were verified when a second bus failed pull up to the TSign and the driver failed communicate the bus route when the first bus left. (J-14, pp. 33-34).

During this litigation, Metro Transit created spreadsheets to track its review of Mr. Segal's complaints ("Defendant's Tracking Sheets"). (J-6A; J-6B; J-11, pp. 88-90; J-12; pp. 128-132, 185-186; J-14, pp. 11-14, 18-19). Defendant created the Tracking Sheets in response to Plaintiff's discovery requests and provided the Tracking Sheet to Plaintiff.

Metro Transit recorded in the column labeled "Verified" on the tracking sheet whether it had verified Mr. Segal's complaint. If Metro Transit verified that the incident occurred, it entered "yes" in the "Verified" column. (J-6A; J-12, pp. 132-133).

Counting the total number of verified incidents entries Ms. Bailly reported on the Tracking Sheets shows she verified that 75 incidents occurred. (HG-2; Goetz Decl. ¶ 6b;[6] *see also* J-16, p. 16).

*Other Complaints Tracking Sheet*

In addition, Metro Transit received 153 complaints between March 17, 2015 and December 6, 2019 from other people with disabilities about buses that did not stop at the TSign or identify the bus route. (HG-7; J-12, pp. 244-45).[7] In response to Plaintiff's discovery requests, Defendant prepared spreadsheets listing these other complaints and provided the spreadsheets to Plaintiff. (J-7 A-C; J-11, pp. 112-116; J-12, pp. 168-174, 244-245). The data reported on these spreadsheets was drawn from Defendant's customer service data base. (J-12, pp. 173-174). The spreadsheet does not include any of Mr. Segal's complaints. (J-12, pp. 112, 114-116, 170).

---

[6]Mr. Segal does not agree that Metro Transit should have determined that only 75 of his complaints were verified. However, for purposes of this motion, Mr. Segal submits that the undisputed evidence of 75 complaints verified by Metro Transit is proof that a repeated pattern of violations exists.

[7]Defendant provided Plaintiff with three spreadsheets reporting complaints made by other people with disabilities. HG-7 is a compilation of the complaints and the date of each complaint taken from all the spreadsheets. (Goetz Decl. ¶6g). The spreadsheets only include complaints made concerning incidents through December 6, 2019. Defendant has not supplemented its discovery responses to provide more current data. There is no reason to believe that the complaints have stopped.

## THE LAW

### Standard for Summary Judgment

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Argenyi v Creighton University*, 703 F34d 441, 446 (8th Cir. 2013); *Minnesota ex rel. N. Pac. Ctr., Inc. v. BNSF R.R. Co.,* 686 F.3d 567, 571 (8th Cir. 2012); *Durand v Fairview Health Services*, 230 F. Supp, 3d 959, 965 (D. Minn. 2017) (applied to cross motions for summary judgment).

Mr. Segal has met his burden of producing undisputed facts showing that Defendant violated the law. Show each element required to prove Defendant liable for violating laws.

### Plaintiff's Legal Claims for Liability

Defendant's drivers repeated failure to stop at the TSign where Mr. Segal was waiting for the bus and communicate the bus route, and Defendant's failure to take required actions to correct this problem, violates three statutes:

- The Americans With Disabilities Act ("ADA") (42 U.S.C. § 12131);

- The Federal Rehabilitation Act (29 U.S.C. § 7 94); and

- The Minnesota Human Rights Act ("MHRA") (Minn. Stat. § 363A.12)

Plaintiff's motion requests summary judgment only concerning the issue of Defendant's liability for violating the statutes. The uncontested facts require the Court to grant Plaintiff's motion as to Defendant's liability. The element of damages is for the jury to determine at trial.

11

Because the requirements of the three statutes are similar, courts generally treat the case law interpreting them as "interchangeable." *Gorman v Bartch*, 152 F.3d 907, 912 (8th Cir. 1998); *Argenyi v Creighton University*, 703 F34d 441, 448 (8th Cir. 2013); *Somers v City of Minneapolis,* 245 F. 3d 782, 788 (8th Cir. 2011).[8]

In order to establish Defendant violated the laws, Plaintiff must prove three elements:

- Plaintiff is a person with a disability;

- Defendant is a public entity covered by the law; and

- Plaintiff was denied the benefits of services, programs, or activities of a public entity **or** was subjected to discrimination by an such entity.

(42 U.S.C. § 12131).  Defendant admits the first two elements. (Answer, ¶¶ 12 -15). At issue in Plaintiff's motion is whether Defendant's conduct violated the requirements of the laws.

The three statutes were adopted for the same purpose: To correct the history of unequal access to public services that people with disabilities have experienced 42 U.S.C. § 12101, *et seq.* (ADA) and 29 U.S.C. § 794 (Federal Rehabilitation Act). Congress recognized that people with disabilities have experienced discrimination and unequal access to services, including bus services, and set as the goal of the nation "to assure equality of opportunity, full participation, independent living and economic self-

---

[8]However, the MHRA differs from the ADA and the Federal Rehabilitation Act by requiring public entities to meet a higher standard. Public entities must "ensure physical and program access for disabled persons." (Minn. Stat. § 363A.12 Subd. 1).

sufficiency" for people with disabilities." (42 U.S.C. § 12101(a)(7); *see also* Minn. Stat. § 363A.02, Subd. 1).

Congress found that: "discrimination against individuals with disabilities persists in such critical areas as … <u>transportation</u> … and access to public services." (42 U.S.C. § 12101 (a)(3) (emphasis added)). It also specifically found that discrimination is not limited to intentional exclusion but also takes other forms. "[I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of … <u>transportation</u>, and communication barriers and relegation to lesser services, programs, activities, benefits, jobs or other opportunities." (12101(a)(5) (emphasis added)).

To correct this problem and to provide people with disabilities with equal access to and benefit from government services, the ADA contains a broad provision requiring equal access to and benefit from services of public entities. "… [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in **<u>or</u>** be denied the benefits of services, programs, or activities of a public entity **<u>or</u>** be subjected to discrimination by an such entity." (42 U.S.C. § 12132 (emphasis added)). The statute is written in the alternative: a public entity may violate the statute by engaging in any of those three types of activity.

The Eighth Circuit has interpreted the federal laws to require entities to provide "meaningful access" to their services to people with disabilities. *Randolph v Rogers,* 170-F.3d 850, 858 (8th Cir. 1999); *Argenyi v Creighton University*, 703 F3d 441, 448-49 (8th Cir. 2013); *Durand v Fairview Health Services*, 902 F3d 836 842 (8th Cir. 2018). In

13

*Argenyi,* the Court explained that "meaningful access" requires providing people with disabilities "equal opportunity… to gain the same benefit" to services provided by the entity. A*rgenyi,* 703 F.3d at 449. The Eighth Circuit has applied this test in cases asserting violations by both public and private entities because the requirements of federal law are essentially the same for both types of entities. *See Argenyi v Creighton University*, 703 F.3d 441, (8th Cir. 2013) (Public Accommodation), and *Loye v Cnty. of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010) (Public Entity); *Bahl v County of Ramsey*, 695 F.3d 778, 783-84 (8th Cir. 2012) (Public Entity).

In order to implement the ADA, Congress directed the U.S. Department of Justice (DOJ) and the U.S. Department of Transportation (DOT) to develop regulations requiring specific types of actions by public transportation agencies to help provide better access to bus service and more effective communication with people who are deaf. (42 U.S.C. § 12134(a)). Public transportation agencies, such as Metro Transit, are covered by the requirements of both the DOJ and DOT regulations. (49 C.F.R. § 37.21 and Appendix D § 37.5 and 37.21; *Americans with Disabilities Act (ADA) Guidance, FTA C 4710.1*, November 4, 2015 (hereafter referred to as "FTA Guidance") pp. 1-4[9]).

The DOJ and DOT regulations broadly require transit agencies like Defendant to provide accessible bus service for people with disabilities, including people who are

---

[9]The FTA Guidance was issued by the Federal Transit Administration in 2015 for the purpose of providing "guidance … necessary to carry out provisions of the Americans with Disabilities Act ("ADA") of 1990, Section 504 of the Rehabilitation Act of 1973, as amended, and the U.S. Department of Transportation's implementing regulations at 49 CFR Parts 27, 37, 38, and 39." (FTA Guidance, p. 1 §1 and Chapter 1.1).

DeafBlind. (28 CFR § 35.149 (DOJ); 49 C.F.R §§ 37.5 and 37.167 (DOT)). The regulations also identify specific actions transit authorities must take to comply with the general requirements. The DOT regulations specifically require public transit authority bus drivers to stop and identify the bus route at bus stops served by more than one bus routes. 49 CFR § 37.167(c). Stopping at the TSign and communicating the bus route information gives riders who are DeafBlind an equal opportunity to use of Metro Transit's bus services. (J-16, p. 152). Metro Transit's Where to Stop policy, set forth in Bulletin 99 (J-1), is Defendant's program to implement the DOT's stop and identify requirement.

In order to ensure that drivers and other personnel of public transportation agencies fully the implement the law, the DOT requires agencies to "train to proficiency" its staff concerning accessibility requirements. (49 CFR § 37.173). A successful stop and route identification program "includes written policies and procedures, appropriate and well maintained equipment, on-going training [and] consistent and fair monitoring … ." *Resource Guide to Effective Approaches for Increasing Stop Announcements and Route Identification by Transit Operators* (hereafter referred to as "Resource Guide"). (Macpherson Decl., ¶4, RJM-3 at p. 32).[10]

---

[10]The Resource Guide is a report prepared for Easter Seals Project ACTION (Accessible Community Transportation In Our Nation), funded through a cooperative agreement with the U.S. Department of Transportation, Federal Transit Administration at p. iii. Mr. Chia, Defendant's expert witness participated in preparing the Resource Guide. (J-16; pp. 113-114).

The DOT regulations also explicitly require Metro Transit vehicles to "provide a means by which an individual with a visual impairment … can identify the proper vehicle to enter" where different buses serving different bus routes stop at the same bus stop. (49 C.F.R. § 37.161(c)). Normally this is accomplished by the bus driver stopping the bus at the bus stop where a person who is blind is waiting and announcing the bus route.

The DOJ regulations require public transit agencies to take appropriate steps to ensure that communications with people who are DeafBlind "are as effective as communications with others." (28 U.S.C. § 35.160(a)(1)). The entity must "ensue that interested persons, including persons with impaired vision or hearing can obtain information as to the existence on location of accessible services, activities and facilities." (28 U.S.C. § 35.163). This means that in order to effectively communicate the bus route information to riders who are deaf, bus drivers must use an alternative communication method, such as gestures, to communicate the bus route to riders who are deaf.

The undisputed facts establish that Defendant's buses have, on repeated occasions failed to stop and identify the bus route, thereby violating the obligations of the ADA and the regulations of the DOJ and the DOT requiring accessible operations of its buses. (HG-3). The undisputed facts also show that Defendant has allowed this practice to continue for four years by failing to adequately and effectively supervise and train its drivers to implement its "Where to Stop" program, as the law requires. Defendant's actions deprived Mr. Segal of an equal opportunity to benefit from Metro Transit's bus service.

**ARGUMENT**

**DEFENDANT'S REPEATED FAILURE TO STOP AT THE TSIGNS VIOLATES THE LAW**

The evidence documented in Defendant's spreadsheets shows there is no dispute that Metro Transit drivers repeatedly failed to stop at the TSign where Mr. Segal was waiting at least 75 times. (HG-2; HG-3; J-16, p. 16). Undisputed facts also show that the same problem exists for other riders with disabilities. (HG-7). These facts clearly demonstrate that Mr. Segal should be granted summary judgment on his claim that Defendant's actions violated the statutes on a regular and systemic basis by failing to provide full and equal access to bus service for Mr. Segal and other people with disabilities as the law requires.

The law requires Defendant to provide Mr. Segal and other people with disabilities full and equal access to its bus services. (42 U.S.C. § 12132, Minn. Stat. § 363A.12). In order for Mr. Segal to have equal access to Defendant's services, Metro Transit drivers must stop at bus stop signs where riders are waiting for the bus. This is necessary for him to have the same safe access to the bus that other riders enjoy and to have the same access to information about the bus route. (J-17, p. 14). The repeated failure of Defendant's buses to stop at the TSign does not provide full and equal access to bus service for Mr. Segal and other people with disabilities.

Defendant's failures to stop its buses at the TSign are not isolated, occasional events. The number of incidents Mr. Segal has reported, and the number of incidents

Metro Transit has verified, demonstrate indisputably that Defendant's drivers regularly and persistently fail to stop the bus at the bus stop sign where Mr. Segal is waiting.

David Chia, Defendant's expert witness concerning bus transportation accessibility, testified that repeated complaints about failing to stop at the bus stop sign is a basis for evaluating Defendant's compliance with the ADA and DOT regulations. (J-16, p. 142). Mr. Chia has substantial experience evaluating transit authority's compliance with DOT regulations, including specifically the DOT stop and identify regulations. (J-16, pp. 42; 141-142).

Mr. Chia described incidents that are similar, repeated and ongoing as a "pattern or practice." (J-16, pp. 72; 74; 85). As Mr. Chia testified: "[T]he concept of pattern or practice is not that you are perfect, but that – that you are on a regular basis and systemically doing things incorrectly," (J-16, pp. 72; 85). Such incidents are not simply accidental or random in nature. (*Id.*) Defendant's expert agreed that verified complaints are important to identify whether patterns or practices exist:

> *Q.*     Do you agree that Metro Transit should use complaint data to look for patterns and practices that14could indicate problems with compliance with Bulletin 99?
>
> *A.*     Yes, complaints once verified, are helpful to -- to look for patterns and practices.

(J-16, pp. 42; 141).

The undisputed fact that Metro Transit verified 75 incidents of buses failing to stop at the TSign demonstrates a repeated and persistent pattern of failure.

In addition to the verified complaints made by Mr. Segal, Metro Transit admits it has received 153 complaints from other riders with disabilities about buses not stopping at TSigns. (HG-7)**.** Defendant's expert witness testified that evidence of complaints made by other individuals provides even greater weight that this is a systemic problem that Defendant is not doing enough to fix. (J-16, p. 55[11]).

### Repeated Failure to Stop at the TSign Violates the Law

Defendant may argue that failing to stop at the TSign is not required by the law, even if it is Metro Transit's policy. Defendant's argument is legally incorrect. It also conflicts with statements made by Metro Transit in the directions it has given its drivers about the Where to Stop policy and in its own documents concerning Mr. Segal's complaints.

The ADA regulations issued by the DOT/FTA require buses to stop at TSigns where riders are waiting. (49 C.F.R § 37.167(c)). This is necessary because riders who are blind are trained to wait for buses at the TSign. (Segal Decl., ¶ 23; J-17, pp. 7, 13; J-16, p. 99). Defendant's expert witness agreed that stopping at the TSign allows people who are DeafBlind to have full and equal opportunity to benefit from Metro Transit's bus service.

> *Q.*     Does communicating to riders the bus route at a bus stop used by multiple bus routes allow people who are deaf-blind to fully use Metro Transit's bus services independently?
>
> MS. ELLINGSTAD: Object to the form of question.

---

[11]Mr. Chia testified that Defendant that other people with disabilities had not complained to Metro Transit about buses not stopping at the TSign. (J-16, pp. 53-54).

> *A.*     Again, there are some riders with those disabilities who even if Metro Transit drivers followed those practices properly would still not be able to; but for those who would make a difference, that – carrying out that practice would make a difference, it would be -it would allow them to do that, to use the bus.

(J-16, pp. 152-53). There is no dispute that Mr. Segal is a rider who is able to use the bus service.

When drivers do not stop at the TSign, Mr. Segal and other riders who are DeafBlind, experience barriers that other riders do not.. Riders who are sighted can see the buses location and can see the pathway to enter the bus Riders who are DeafBlind and blind cannot clearly see the pathway to safely enter the bus. They cannot see whether they might encounter obstacles or an uneven surface. (J-10, p. 42; J-17, p. 15).   Shannon Wright, Plaintiff's expert witness explained:

> If an individual who is DeafBlind is waiting at the designated bus stop sign and the bus does not stop at the sign, the individual may not be able to identify or locate the bus or   the entrance to the bus.  The individual may not be able to identify obstacles between themselves and the bus. This could become a potentially dangerous or harmful, high-risk situation should the individual attempt to navigate to where they "think" the bus is located. They could misjudge a distance and misstep causing them to fall or injure themselves or someone else. They could walk into the roadway "thinking" that that is where the bus is located, but the bus could have moved away from this location by the time that they  attempt to move to it, causing confusion and a potentially dangerous or harmful, high-risk situation.

(J-17, p. 15). When drivers stop at the TSign, they provide Mr. Segal and other riders who are blind or DeafBlind with unobstructed access to the bus. (J-17, p. 13).

The failure of Metro Transit's drivers to stop the bus reasonably close to the TSign also results in communication barriers which violate the DOT requirements. DOT regulations require buses to stop close enough to the TSign to effectively communicate

the bus route information to DeafBlind riders. (49 C.F.R §37.167(c); *see also:* J-16, pp.

99-100; 108-109; Topic Guides on ADA Transportation, Topic Guide 2: Stop

Announcements and Route Identification (hereafter referred to as "Topic Guides") RJM-

2, pg. 14 [12])). Mr. Chia testified:

> *Q.*     Is part of the reason for stopping at a T sign where a customer is
> waiting -- and let's assume the customer is deaf -- is that to allow the driver
> to effective communicate the route number to the waiting customer who's
> deaf?
>
> *A.*     Yes.
>
> *Q.*     Why is that?
>
> *A.*     Because -- well, the -- at that -- the driver can open up the door and
> provide some tactile communication.

(J-16, p. 101).

Defendant admits that Metro Transit's policy requires drivers to communicate the

bus route number to riders who are deaf. (J-12, p. 190).

When drivers do not stop close enough to the TSign where Mr. Segal is waiting,

Mr. Segal cannot effectively communicate with the driver. Mr. Segal, and others who are

DeafBlind, do not know which bus route it is when drivers do not stop and communicate

the bus route because, unlike ricers who are sighted, they cannot see the electronic bus

route number on the bus. (J-17, p. 15).  Mr. Segal must communicate directly with drivers

to learn the bus route. He must use non-audible communication (such as holding up

---

[12]The FTA funded the Topic Guides which were prepared by Disability Rights
Education and Defense Fund ("DREDF"). They are found at https://dredf.org/ADAtg. A
link to the Topic Guides is also found on the FTA website.

fingers) to effectively communicate about the route number of the bus, which cannot take place if the bus does not stop close enough to the TSign where the rider is waiting. (Segal Decl., ¶ 23; J-5; J-16, pp. 108-109).

Metro Transit documents concerning its Where to Stop policy contradict Defendant's argument and confirm Metro Transit's knowledge that compliance with ADA and DOT regulations requires drivers to stop at the TSign. Metro Transit admits that the purpose of its Where to Stop policy is "to help insure compliance with the ADA." (J-11, p. 51). The Where to Stop training video Metro Transit also clearly states that the purpose of the stop and identify policy is to comply with the ADA. The Title of the video is " The Americans With Disabilities Act and Metro Transit Bus Stop. (J-5). Email messages Ms. Bailly wrote concerning Mr. Segal's complaints identified incidents as "ADA Violations" by drivers. (RM-7). Defendant admitted that the reference means "violating our policy for the ADA." (J-12, p. 246).

In addition, Metro Transit identified verified complaints as "ADA Violations" in the Discipline Summary column (Column K) of the initial versions of the spreadsheet used for tracking Mr. Segal's complaints. (RJM-10). That admission was deleted in later versions of the spreadsheet during this litigation, including J-6A. (J-15, p. 180).

### *Defendant's Buses Did Not Stop Reasonably Close to The TSign*

Mr. Segal anticipates Defendant will argue that the law does not require its buses to stop precisely at the TSign. Its buses must only stop reasonably close to the TSign. Mr. Segal agrees with Defendant's interpretation of the law on this point. Both parties agree that Metro Transit buses must stop within one foot of the TSign. The undisputed facts

22

prove that Metro Transit's buses have regularly and repeatedly failed to stop within that distance of the TSign.

When Metro Transit verified 75 of Mr. Segal's complaints, Ms. Bailly reviewed the bus videos and determined that the buses violated Defendant's Where to Stop policy because they did not stop reasonably close to the TSign where Mr. Segal was waiting. (J-12, pp. 187-190). The standard she used was whether she could see in the bus video any part of Mr. Segal or his dog in the doorway of the bus when it stopped. (J-12, pp. 189-190). Metro Transit's complaint verification records prove there is no dispute that on at least 75 occasions Defendant's buses did not stop reasonably close to the TSign where Mr. Segal was waiting for the bus.

Metro Transit's standard for determining whether a driver complied with the Where to Stop policy with regard to Mr. Segal's complaints is consistent with the standard identified by Defendant's expert witness. Mr. Chia testified that in order to stop reasonably close to the TSign where a DeafBlind rider is waiting, the bus must stop within one foot of the sign. (J-16, p. 103). Defendant's measurement standard, the width of the bus entry doorway. is three feet, which is slightly more than one foot either side of the TSign when the entry doors are centered on the TSign. (Macpherson Decl., ¶ 6; RJM-5).[13]

---

[13]The sign on the bus doorway directing passengers to enter through the rear door was not present prior to the COVID pandemic precautions. Mr. Segal always entered the bus through the front door.

## FAILURE OF SECOND BUS IN LINE TO PULL UP
## TO THE TSIGN VIOLATES THE LAW

In order to ensure that riders who are DeafBlind or blind have equal access to bus service, the DOT issued a regulation requiring all vehicles to stop at bus stops and identify the route of the bus. "Where vehicles … for more than one route serve the same stop, the entity shall provide a means by which an individual with a visual impairment or other disability can identify the proper vehicle to enter or be identified to the vehicle operator as a person seeking a ride on a particular route." (49 C.F.R. § 37.167(c)). This is commonly referred to as the stop and identity requirement. In order to comply with the DOT regulations, Metro Transit implemented its Where to Stop policy. (J-1; J-5).

There is no dispute that the bus stops where Mr. Segal complained that Second Bus incidents occurred service more than one route.

Christy Bailly, Defendant's Director of Bus Operations, admitted that these Second Bus incidents are ADA violations.

> *A.* My understanding of the ADA, based on what we've trained our driver on in the past, is that any location where more than one bus route stops, you are required to check for a person that might have a disability. And all disabilities aren't visible. And if there's someone waiting, you would move up and announce the route of the bus.
>
> BY MR. MacPHERSON:
> *Q.* And is it your understanding that the failure to announce the route of the bus is an ADA violation?
>
> *A.* Yes.

(J-15, p. 184). When the drivers of second buses in line do not pull forward to the TSign and communicate the bus route number to waiting riders who are blind or DeafBlind, Defendant has violated the DOT stop and identify requirement.

Metro Transit's documents establish that for the past four years Mr. Segal regularly and repeated experienced instances when second buses did not pull forward and announce the bus route when the first bus left. (J-12, pp. 191-193; HG-1; HG-3). Metro Transit verified at least 23 Second Bus incidents occurred involving Mr. Segal. (HG-1; HG-2).

The purpose of the stop and identify requirement is to effectively provide information to persons who are blind or deaf who are waiting for a bus whether a bus is the bus the rider is waiting for. (J-15, pp. 151-152). Metro Transit buses normally have an electronic sign on the front of the bus which identifies the route of the bus. However, a rider who is blind cannot see the route sign on the bus. (Segal Decl., ¶¶ 9; 21; J-14, p. 63). The bus driver must pull forward to the TSign to communicate the bus route information directly to the rider who is blind or DeafBlind. In the case of Mr. Segal, this involves Mr. Segal entering the bus and communicating with the driver using gestures (holding up the fingers to indicate the bus route number). (Segal Decl., ¶ 23).

As Defendant's expert witness (Mr. Chia) testified: if the bus does not stop at the TSign, the driver cannot make the route announcement the DOT regulation requires. (J-16, pp. 20, 99-101). When the second bus does not pull forward to the TSign, and its driver does not communicate its route number, Mr. Segal (and other deaf, blind and DeafBlind riders) do not know the route number of the bus that has just passed them.

25

Defendant's admissions and documents prove there are no material facts in dispute concerning the repeated failure of Second Buses to pull forward to the TSign and communicate the bus route to Mr. Segal when an earlier bus leaves. These undisputed repeated failures prove that Defendant failed to comply with the DOT's stop and identify regulation.

## DEFENDANT FAILED TO ADEQUATELY MONITOR AND TRAIN ITS PERSONNEL

In order for a transit agency to implement an effective and successful Where to Stop policy, a transit agency must effectively monitor and train its drivers and supervisors concerning the policy. The uncontested facts show that Defendant did not adequately monitor and train its drivers and staff concerning the duty to stop at the TSign and identify the bus route, in violation of the law.

The DOT regulations require Metro Transit to train its staff to proficiency concerning providing accessible bus service for people with disabilities. (49 C.F.R. § 37.173(c)). The DOT explained the purpose of the regulation: "A well-trained workforce is essential in ensuring that the accessibility-related equipment and accommodations required by the ADA actually result in the delivery of good transportation service to individuals with disabilities." (49 C.F.R. Appendix D, § 37.173).

"Train to proficiency" means that "once trained, personnel can consistently and reliably operate accessibility features, provide assistance to individuals with disabilities and treat riders in a respectful and courteous way." (FTA Guidance 2.9 (at 2-20) (emphasis added)).

*Defendant Failed to Effectively Monitor Compliance by Its Drivers*
*with the Where to Stop Policy*

"Training to proficiency" requires more than formal training sessions. It also requires Defendant to monitor its drivers to ensure that they comply with training and bulletins, and actually deliver the service. (J-16; pp. 111-112). Training its drivers and staff to proficiency concerning Metro Transit's Where to Stop policy requires Defendant to implement an effective practice of monitoring compliance with the policy. FTA Guidance" (§ 6.7.2 (pp. 6-13) and § 12.8 (pp. 12-11)).

Defendant admits that Metro Transit did not have a system-wide program for monitoring compliance with its Where to Stop policy in place at the time Mr. Segal was reporting violations of the policy. (J-12, pp. 193-194; J-14, p. 57; J-15, pp. 134-139; J-16, pp. 64-65).

> *Q.*    Okay. As part of the process of investigating the complaints, there are a number of complaints, let's say, of the same type, at the same location, would – did Metro Transit ever send somebody to the bus stop to observe it, to observe what was happening?
>
> *A.*    No.

(J-12, p. 193).

As the Resource Guide informed Defendant and all other transit agencies: "Monitoring operator performance is one of the most important ingredients in the development of a stop announcement and route identification program." (RJM-3, p. 54).

The FTA's Guidance concerning the accessibility requirements of DOT regulations, directs Defendant and other transit agencies to monitor whether drivers are communicating bus route announcements. "To ensure compliance with the route

identification requirements, transit agencies <u>must</u> sufficiently monitor their operators' performance." (FTA Guidance, Section 6.7.2 (pp. 6-13)). "Transit agencies <u>must</u> sufficiently monitor their service, provided in house or by contractors, in order to confirm internally, and in some cases to FTA during oversight activity, that the service is being delivered consistent with the ADA requirements." ( FTA Guidance, § 12.8 (pp. 12-11) (emphasis added); *see also,* J-16, pp. 125-126).

The FTA's use of the word "must" shows these are mandatory requirements.

The FTA has also issued training materials for public transit agencies explaining the regulations and the FTA Guidance, which emphasize the importance of monitoring. *FTA-ADA General Requirements, Oversight and Monitoring, FTA Circular 4710.1* Chapter 12: Monitoring p. 14 (*see* RJM-4, at RJM-4-3) ("Transit agencies must sufficiently monitor their services."); *see also: Topic Guides* at p. 19 (RJM-2-7) ("Proactive monitoring… [is] vital to the successful implementation of … route identification policies.")

Defendant admits that prior to October 2019, Metro Transit did not monitor its operators' compliance with DOT stop and announce requirements or its Where to Stop policy. (J-12, p. 194; J-14, p. 57; J-15, pp. 134-319.; J-16, pp. 64-65.) Metro Transit did not even attempt to monitor the bus stops where Mr. Segal was reporting violations until October 2019 and then only after Ms. Bailly was asked during her deposition in August 2019 whether Metro Transit was monitoring the location. (J-1; J-14, pp. 57, 60; J-15, pp. 134-139).

David Chia, Defendant's expert witness, testified in his deposition that Metro Transit must have a process to effectively monitor its staff to determine the degree of compliance with its policies and procedures including the Where to Stop policy. (J-16, pp. 122-123). He stated that monitoring is "part of the system to help ensure that a transit agency is carrying out its responsibilities for accommodating people with disabilities." (*Id.,* p. 52). Mr. Chia testified that a "results oriented monitoring program designed to encourage compliance [with the stop and announce program] and address non-performers is a key component of a successful program. (*Id.,* p. 129). Monitoring compliance is necessary to show drivers and the public that the agency understands the importance of carrying out the stop and announce program and to improve driver compliance with the program. (*Id.,* pp. 129; 132-133).

The obligation to monitor compliance with the stop and identify requirement is so important that the FTA includes sample monitoring forms with the FTA Guidance. (FTA Guidance, at Attachment 6-2). There is no evidence that Defendant developed or used any similar monitoring form to implement and supervise driver compliance with its Where to Stop policy.

When the FTA evaluates a transit agency concerning compliance with DOT's stop and announce requirements, evaluating the transit authority's monitoring system is an important element of its evaluation of the effectiveness of the authority's stop and announce program. (J-16, pp. 33-34; J-18, p. 3). Mr. Chia participated in nine DOT evaluations of transit agency programs between 2001-2018. (J-16, p. 31; J-18, p. 3). Each of the evaluations included evaluating the agency's monitoring program. (J-16, pp. 33-

34). The evaluators, including Mr. Chia, conducted their own monitoring of each agency's drivers' compliance with the stop and announce programs. (J-16, p. 135).

Another important purpose of a monitoring program is to evaluate whether the agency's stop and identify program is effective. (Macpherson Decl., ¶ 4; RJM-3, p. 36). Mr. Chia testified that it is important for transit agencies to use a monitoring system to collect data and develop statistical reports "help them make better informed decisions about the way to approach improving – improvement" of compliance. (J-16, p. 133). With regard to Metro Transit, Mr. Chia testified monitoring should be "leading to improve compliance" with the Where to Stop policy. (J-16, p. 130). Mr. Chia was not aware of any data collection or statistical reporting system based on monitoring that Metro Transit used. (J-16, p. 133).

Because Defendant did not have any system-wide monitoring program, Defendant had no way of objectively knowing whether operators were following the policy of Bulletin 99, and no way of knowing whether further training and supervision was needed to enforce its Where to Stop policy.

Even though Metro Transit knew from the complaint reports made by Mr. Segal and other riders that drivers were not complying with DOT regulations and the Where to Stop policy, it did not direct its supervisors to observe the bus stops where many problems were occurring. For example, even though Defendant knew a large number of verified incidents were occurring at the University of Minnesota West Bank bus stop, it did not send a supervisor to observe and monitor the University of Minnesota West Bank

30

bus stop until October 2019, long after Mr. Segal began reporting incidents at the West Bank stop. (J-12 p. 194; J-14, p. 57).

Even when Metro Transit finally sent supervisors to the West Bank bus stop in late 2019, it did not implement an effective monitoring program. Ms. Bailly admitted she did not give the monitors any instructions about what to do. (J-15, pp. 140-141). She did not take any action to supervise the program or to evaluate whether it was effective. (J-15, pp. 166-167, 176-177). Monitors did not report what they observed to her. (*Id.*, p. 161).

An effective monitoring program would have allowed Metro Transit to quickly evaluate operator compliance with its policy and take more immediate supervisory action to improve compliance. (J-16, pp. 122-123, 129). An effective monitoring program drives home the message that the transit agency believes the Where to Stop policy is important and will be enforced. (J-16, pp. 129, 132-133). Because Metro Transit lacked any monitoring program, the elements of reinforcement and reminding were missing from Metro Transit's program for complying with the DOT stop and announce requirement.

These undisputed facts prove that Metro Transit did not have an effective program for monitoring bus drivers' compliance with the DOT regulations. They also prove that Metro Transit did not comply with the DOT requirement that it train its operators to proficiency concerning the stop and identify requirements of the DOT regulation.

*Defendant Did Not Have an Effective Program for Training Drivers Where to Stop*

Defendant did not train any of its drivers about where to stop for passengers who are blind until the fall of 2017, more than a year after Mr. Segal began his complaints. It

did not train its drivers about the obligation to stop and announce the bus route between 2012-2017. (J-13, pp. 22-23; J-14, p. 76).

Defendant did not even implement its Where to Stop policy until more than a year after Mr. Segal made his first complaint. Defendant admits that no policy existed prior to November 30, 2017. (J-11, p. 48; J-14, p. 76).

On several occasions when drivers did not stop at the TSign, Mr. Segal asked whether the driver had been trained about stopping the bus at the TSign. The drivers told him they had not been trained about that. (J-10, pp. 71-78).

David Stoffer, Metro Transit's Manager of Instruction, testifying as Defendant's designated Rule 30b6 witness on this topic, admitted that Defendant's training program for drivers did not explicitly address the problem of drivers not stopping at the TSign until it finally included this topic in the 2017-2018 POD (professional Operator Development) training, more than a year after Mr. Segal began reporting problems. (J-14, p. 76; J-13, p. 22). When Metro Transit did include training about accessibility for blind riders in the POD sessions, the training did not explicitly address stopping at TSigns. J-13, pp. 34-35). The representative of Defendant's ADA office who presented at the POD training did not include any presentation concerning Bulletin 99 or the Where to Stop policy in the outline for the training program. (J-11, pp. 61-63).

Defendant's expert testified that Metro Transit did not effectively train its new drivers (which Defendant calls Part Time Drivers) concerning Metro Transit's Where to Stop policy. Defendant did not include any role-playing activity in the training it gave to

new drivers, which Mr. Chia testified was a typical topic in the training other transit authorities provide to their new drivers. (J-16, pp. 45-48).

Defendant's primary method of reinforcing the Where to Stop policy was to reissue Bulletin 99, which it has done four times since November 2017. (Goetz Decl. ¶ 6d). Ms. Bailly admitted that complaints regarding driver failure to stop at the TSign continued each time Defendant reissued Bulletin 99. (J-11, pp. 57, 60-61; J-14, p. 233; HG-4).

*Complaints of Repeated Failure to Stop and Identify Demonstrate Defendant Did Not Train Drivers to Proficiency*

The FTA has informed Defendant and other transit agencies that rider comments and complaints "can be the ultimate tests of proficiency; comments that reveal issues the provision of service may serve as good indicators that employees are not trained proficiently." (FTA Guidance §§ 2.9 (at 2-21) and 12.74 (at 12-11)). The undisputed evidence that Defendant received 150 complaints from Mr. Segal and 153 complaints from other riders with disabilities that drivers were not complying with the Where to Stop policy proves that Defendant was not training its drivers to proficiency concerning their duty to stop at the TSign and identify the bus route.

Defendant it did not evaluate the effectiveness of the training it provided its drivers concerning where to stop the bus and the requirement of announcing the bus route. Mr. Stoffer testified Metro Transit did not evaluate whether the number of verified complaints about drivers failing to follow the Where to Stop policy decreased to

determine whether the training was successful in changing the behavior of drivers. (J-13, pp. 95, 97; J-16, p. 95).

These undisputed facts prove that Defendant failed to have an adequate and effective program to train its bus operators about the requirement to stop at TSigns and to announce bus routes.

## **CONCLUSION**

Mr. Segal and other riders who are DeafBlind and blind are legally entitled to safe and reliably accessible service on Metro Transit buses. The law requires Metro Transit drivers to stop at the TSign marking the bus route and to effectively identify the bus route in order to provide accessible service. The law also requires Metro Transit to monitor and train its drivers to comply with the DOT/FTA stop and identify regulation.

The undisputed facts show that Defendant's drivers repeatedly and persistently failed to stop at the TSign where Mr. Segal was waiting and failed to effectively identify the bus route to him. The undisputed facts also show that Defendant had no program for monitoring driver compliance with its Where to Stop policy and failed to adequately train its drivers.

Mr. Segal has therefore met his burden of showing that the uncontested facts establish that Defendant's actions violated requirements of the ADA, Federal Rehabilitation Act, and the MHRA. The Court should grant his motion for partial summary judgment as to liability.

**MID-MINNESOTA LEGAL AID**
**MINNESOTA DISABILITY LAW CENTER**

Date: July 30, 2020

By: /s/ Roderick J. Macpherson III
    Roderick J. Macpherson III
    Attorney ID No. 66163
111 North Fifth Street ~ Suite 100
Minneapolis, MN 55403
(612) 746-3731
rjmacpherson@mylegalaid.org

**ATTORNEYS FOR PLAINTIFF**